UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division

| | |
|---|---|
| ANALIA Y. HUBER, Individually and as Trustee for the Heirs and Next-of-Kin of LOWELL D. HUBER, deceased,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | Civil Action No. _____ |

**COMPLAINT**

Analia Y. Huber, Individually and as Trustee for the heirs and next-of-kin of Lowell D. Huber, deceased, by counsel, states as follows for her Complaint against Defendant United States of America:

**Jurisdiction and Venue**

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2. In compliance with 28 U.S.C. § 2675, Mrs. Huber filed a notice of administrative claim with the Department of Veterans Affairs on February 21, 2016, which is attached as **Exhibit A**. That claim was subsequently denied by the VA on May 22, 2017. On October 30, 2017, Mrs. Huber requested the VA reconsider its denial of

her claim. More than six months have passed, and the VA has not acted on Mrs. Huber's claim on reconsideration.

3. Accordingly, Mrs. Huber's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

4. Plaintiff has complied with Minnesota Statute § 145.682 and attached the required Certification of Expert Review Affidavit as **Exhibit B**.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because Mrs. Huber resides within the Middle District of Florida at 11629 Balintore Drive, Riverview, FL 33579.

6. At all times relevant to this action, the United States owned and operated the Minneapolis VA Medical Center ("Minneapolis VAMC") in Minneapolis, Minnesota, and its affiliated outpatient care centers.

7. At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mr. Huber.

8. Mr. Huber was a veteran of the United States Navy, and thus was entitled to medical care and treatment at the Minneapolis VAMC and its affiliated outpatient care centers.

9. The medical care described as follows was provided to Mr. Huber at the Minneapolis VAMC and/or its affiliated clinics unless otherwise stated.

## Allegations

10. Plaintiff re-states and re-alleges paragraphs 1 through 9 as if fully stated herein.

11. Mr. Huber was a 66-year-old man with a medical history significant for hypertension, hyperlipidemia, and diabetes mellitus type II. Mr. Huber also had a history of alcohol use, smoking, and exposure to Agent Orange. His family history was significant for coronary artery disease, congestive heart failure, myocardial infarction, and pulmonary embolism.

12. On August 13, 2013, Mr. Huber was seen by Dr. Oanh-Constance Thai for complaints of chest pain and tingling in his arm. Dr. Thai ordered an EKG, which showed a right bundle branch block. Dr. Thai documented in the medical records that Mr. Huber had a "high cardiac risk" and ordered a nuclear stress test.

13. The nuclear stress test, however, was not completed until almost one month later on September 9, 2013. The results of this test indicated that Mr. Huber's left ventricular ejection fraction was 60%.

14. The following day, on September 10, 2013, Mr. Huber again called Dr. Thai's office to report shortness of breath and numbness in his arms. Mr. Huber asked Dr. Thai to send him a follow-up letter with a plan of care and referral to a cardiologist. Dr. Thai sent a letter to Mr. Huber which stated the results of his stress test were normal, but she did not provide a plan of care or referral to a cardiologist.

15. On November 18, 2013, Mr. Huber called Dr. Thai's office again complaining of frequent episodes of numbness and tingling in his arms, chest tightness,

and difficulty breathing. The medical records document that Mr. Huber went on to state that for the past year he had "been experiencing something that I can only describe as mini heart attacks." Mr. Huber's message was relayed to Dr. Thai, who responded to the patient by way of her nurse. Dr. Thai indicated that if Mr. Huber experienced chest pain, he needed to be evaluated at the emergency department on the same day. Mr. Huber's response to Dr. Thai's statement was: "I don't get this. Why didn't she tell me that months ago when we talked about this in the clinic?" Again, Dr. Thai failed to refer Mr. Huber to a clinical cardiologist for further work-up and evaluation of his ongoing symptoms.

16. Mr. Huber requested a primary care provider change due to the lack of care he was receiving from Dr. Thai. On February 10, 2014, a coordination of care letter was issued to Mr. Huber which transferred his care from Dr. Thai to Janice L. James, a Certified Family Nurse Practitioner.

17. On February 27, 2014, one day before his scheduled appointment with his new VA primary care provider, Mr. Huber presented to Fairview Ridges Hospital emergency department with complaints of chest pain (rated as an eight out of 10), shortness of breath, and "burning numbness" in his arms. Mr. Huber indicated that he had been experiencing intermittent chest pain for months but "the VA told him his heart is at 60% and they were ok with that."

18. Mr. Huber was examined and had labs, EKG, and a chest X-ray performed. He was administered oxygen via nasal cannula, aspirin, IV heparin, nitroglycerin, and morphine. The medical records indicate that Mr. Huber was to be transferred to the Intensive Care Unit, but a lack of beds left Mr. Huber with a choice of being transferred to

the Minneapolis VAMC or to Fairview Southdale Hospital. Mr. Huber chose to be transferred to Fairview Southdale Hospital.

19.     On February 28, 2014, Mr. Huber was evaluated by Dr. Sujatha Tata at Fairview Southdale Hospital. Dr. Tata noted that Mr. Huber had been experiencing intermittent chest pain for several months and that he had "a positive troponin consistent with a non-ST elevation myocardial infarction." Dr. Tata also noted that Mr. Huber's creatinine and D-dimer levels were elevated and that his chest X-ray showed "pulmonary edema with congestive heart failure which could be contributing to his intermittent shortness of breath for the last 5 months." Mr. Huber was started on pravastatin and IV Lasix.

20.     Cardiology was then consulted due to Mr. Huber's elevated troponin level and ongoing chest discomfort. Dr. Robert Ketroser ordered an echocardiogram to evaluate Mr. Huber's left ventricular size and function, and noted that a coronary artery angiography would probably also be necessary.

21.     On February 28, 2014, Mr. Huber had an echocardiogram which revealed an ejection fraction of approximately 30% with Grade III left ventricular diastolic dysfunction.

22.     On March 2, 2014, Mr. Huber underwent selective coronary artery angiography and left heart catheterization. These procedures revealed "[s]evere somewhat diffuse 3-vessel coronary artery disease with an occluded right [coronary artery] and LV dysfunction." A cardiothoracic surgery consultation was ordered for consideration of bypass surgery.

23. Mr. Huber was seen by Dr. Gregg Anderson, a cardiothoracic surgeon, on March 3, 2014. Dr. Anderson recommended bypass surgery, which was scheduled for March 5, 2014.

24. Mr. Huber underwent coronary artery bypass surgery performed by Dr. Anderson on March 5, 2014. Although Mr. Huber tolerated the surgery, he required an intra-aortic balloon pump for pacing. Upon completion of the surgery, he was transferred to the ICU.

25. Postoperatively, Mr. Huber was hypotensive and required continual adjustments in his pressor support. He suffered persistent acidosis and his creatinine levels and liver function also began to worsen. Mr. Huber then went into renal failure and required an increase in pressors to maintain his blood pressure. Dialysis was considered, but it was determined that Mr. Huber was not an appropriate candidate given his critical condition.

26. On the evening of March 7, 2014, Mr. Huber went into ventricular fibrillation and suffered cardiac arrest. Resuscitation was attempted for approximately 20 minutes, but Mr. Huber could not be revived and was pronounced dead.

27. Mr. Huber's Certificate of Death, signed by Dr. Anderson, identifies renal and liver failure as the immediate cause of death, with cardiogenic shock and coronary artery disease listed as underlying causes.

28. The blockage(s) in Mr. Huber's arteries developed over many years, and he had coronary artery disease long before he entered the Fairview Ridges and Fairview Southdale Hospitals.

29. Despite Mr. Huber's symptoms, medical history, and family history, Dr. Thai failed to diagnose Mr. Huber with coronary artery disease while in her care.

30. Despite Mr. Huber's symptoms, medical history, and family history, Dr. Thai never referred him to see a cardiologist.

31. By the August 13, 2013 office visit with Dr. Thai, and certainly by the September 10, 2013 and November 18, 2013 visits, it was clear that Mr. Huber, who was already a high cardiac risk patient, had a worsening heart condition and was in need of care from a clinical cardiologist. However, Dr. Thai failed to appreciate the significant of Mr. Huber's risk factors and symptoms.

32. In light of Mr. Huber's multiple cardiovascular risk factors and his continued complaints of ongoing symptoms of substernal chest pain and arm tingling and numbness, the standard of care required that Mr. Huber be referred to a clinical cardiologist for additional evaluation and testing following these August, September, and November 2013 visits.

33. The failure on the part of Dr. Thai and the Minneapolis VAMC medical staff to refer Mr. Huber to a clinical cardiologist was a breach of the standard of care.

34. Referral to a cardiologist, with appropriate medical work-up and testing, would more likely than not have resulted in an earlier diagnosis of Mr. Huber's coronary artery disease.

35. Earlier diagnosis of Mr. Huber's coronary artery disease would more likely than not have led to earlier medical intervention and treatment, before Mr. Huber suffered a myocardial infarction and resulting cardiac damage.

36. Earlier medical intervention and treatment, including cardiac catheterization, percutaneous coronary intervention, and/or cardiac bypass surgery, would more likely than not have resulted in successful treatment of Mr. Huber's cardiac disease, thereby avoiding his death from post-operative complications suffered due to the cardiac damage caused by the avoidable myocardial infarction. Indeed, timely referral for evaluation and treatment by a clinical cardiologist would have significantly extended Mr. Huber's life and would have improved the quality of his remaining years.

37. Mr. Huber's pain, suffering, and death, and Mrs. Huber's loss of consortium and other economic and non-economic losses, are a direct result of the negligent care provided to Mr. Huber by Dr. Thai at the Minneapolis VAMC.

## **Negligence**

38. Plaintiff re-states and re-alleges paragraphs 1 through 37 as if fully stated herein.

39. As a provider of medical services to Mr. Huber, the United States and its agents, servants, or employees at the Minneapolis VAMC and its affiliates, including but not limited to Dr. Thai, owed Mr. Huber a duty to provide him medical care consistent with the governing standard of medical care.

40. The agents, servants, or employees at the Minneapolis VAMC and its affiliates, including but not limited to Dr. Thai, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

(a) negligent failure to timely and appropriately follow up on Mr. Huber's repeated complaints of recurring substernal chest pains, chest tightness, shortness of breath, and arm numbness;

(b) negligent failure to timely and appropriately assess, diagnose, and treat Mr. Huber's coronary artery disease in light of his concerning medical and family history;

(c) negligent failure to refer Mr. Huber to a cardiologist or other appropriate specialist; and

(d) any and all other deviations from the standard of care which will be developed through further investigation, discovery, and expert review.

41. As a direct and proximate result of the negligence of Defendant, Plaintiff claims the following damages:

(a) compensation for all economic damages, including medical expenses, past and future lost wages, benefits, earnings, earning capacity, and funeral and burial expenses;

(b) compensation for all non-economic damages, including sorrow, mental anguish, loss of solace, advice, assistance, protection, counsel, care, guidance, affection, society, services, comfort, companionship, love, consortium, and the decedent's mental, physical, and psychological pain and suffering;

(c) compensation for any other damages sustained by Plaintiff as a proximate result of the negligence of Defendant's employees and/or agents.

WHEREFORE, Mrs. Huber requests that the Court grant judgment in her favor against the Defendant in the amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000.00), together with any other costs as she may be lawfully entitled to recover.

        Respectfully submitted,

        ANALIA Y. HUBER,
        Personal Representative of
        the Estate of LOWELL D. HUBER,
        deceased

By: */s/ Vanessa L. Brice*
**Vanessa L. Brice, Esq.**
Fla Bar Num.: 0076434
Colling Gilbert Wright & Carter
801 N. Orange Avenue, Suite 830
Orlando, FL 32801
Telephone: (855) 880-4741
Facsimile: (407) 712-7301
vbrice@thefloridafirm.com
Local Counsel for Plaintiff

**Brewster S. Rawls, Esq.**
Virginia State Bar No. 23604
**Glen H. Sturtevant**
Virginia State Bar No. 73458
Rawls Law Group, PC
211 Rocketts Way, Suite 100
Richmond, VA 23231
Telephone: (804) 344-0038
Facsimile: (804) 782-0133
brawls@rawlslawgroup.com
gsturtevant@rawlslawgroup.com
Trial Counsel for Plaintiff